JONI J. JONES (7562)
Assistant Utah Attorney General
MARK L. SHURTLEFF (4666)
Utah Attorney General
Attorneys for Defendants
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0150
E-mail:  jonijones@utah.gov

---

### IN THE UNITED STATES DISTRICT COURT IN AND FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| KARL GRANT LOSEE, | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
|---|---|
| Plaintiff, | |
| v. | |
| RICHARD GARDEN, et al., | Case No. 2:07-CV-911 |
| Defendants. | District Judge Dee Benson |
| | Magistrate Brooke C. Wells |

Pursuant to Rule 56-1(b) of the Rules of Practice for the District of Utah,

Defendants  Sidney Roberts, M.D., Richard Garden, M.D. and Kennon Tubbs, M.D,

(collectively Defendants or Doctors) file this memorandum of authorities in support of

their motion for summary judgment.

## <u>STATEMENT OF UNDISPUTED FACTS</u>

For purposes of this Motion for Summary Judgment only, the following facts are undisputed.

1.  Dr. Garden is the Administrative and Clinical Director over health services for the Utah Department of Corrections.  (Declaration of Dr. Garden, Exhibit 2 to *Martinez* Report, Docket No. 60.)

2.  In April 2007, Dr. Garden first became aware of inmate Karl Grant Losee as a result of a call from the sentencing Judge who was aware of the difficult time the Adult Detention Center—where Losee had been prior to his incarceration at the Utah State Prison—had managing his diabetes. (Losee/USP 000001.)

3.  Dr. Tubbs is a physician at the Utah State Prison, and he did the initial screening of Losee, including prescribing insulin for Losee's diabetes.  (Declaration of Dr. Tubbs, Exhibit 4 to Defendants' *Martinez* report.)

4.  Dr. Tubbs prescribed Losee's insulin based on what Losee reported he had taken prior to being incarcerated.  (Tubbs declaration ¶¶ 7-8.)

~~5.~~  Dr. Tubbs had no other involvement in Losee's care.  (Tubbs declaration ¶ 9.)

6.  During the time of the allegations in the complaint, Dr. Roberts was Losee's primary care physician and handled most of Losee's treatment.    (Garden declaration ¶8.)

7.   On April 27, 2007, Dr. Roberts put in a request for Losee to be evaluated at the University of Utah Medical Center for his diabetes.   (Dr. Roberts declaration, attached to Defendants' *Martinez* report as Exhibit 3.)

8.   On May 4, 2007, Dr. Roberts saw inmate Losee.  At that time, Losee was on Lantus insulin, which is what he was receiving at the Adult Detention Center, where he had been prior to being incarcerated at the Utah State Prison (USP).  He was also receiving "regular insulin," which is a short-acting insulin.   (Dr. Roberts Declaration ¶ 7; Losee/USP Medical 000047 and 000066.)

9.   On May 4, 2007, Dr. Roberts ordered a complete blood test in order to monitor Losee's diabetic control and evaluate him for any complications. Dr. Roberts ordered these tests because he was a new inmate and the medical staff needed baseline data in order to effectively treat and monitor his diabetes.  (Dr. Roberts Declaration ¶ 8;Losee/USP Medical 000063.)

10. On May 11, 2007, Dr. Roberts saw Losee for a follow up.  They discussed making some changes to his insulin.  During the meeting, Losee stated matter-of-factly that his diabetes would not be controlled while he is in prison. (Dr. Roberts Declaration ¶ 9;Losee/USP Medical 000047.)

11. Losee was seen at the UMC on June 1, 2007.  (Losee/USP Medical 1062.)

12. Dr. Chamberlain, who saw Losee, recommended that he take Lantis and Humalog insulins.  Humalog is an ultra fast-acting insulin and must be administered immediately before or after mealtime.  The dosage is calculated based on the meal that is eaten.  That

is, the amount of insulin taken is based on the calorie content of the meal.  (Dr. Roberts declaration ¶ 12.)

13. On June 12, 2007, Dr. Roberts discussed the UMC recommendations with Plaintiff, and Dr. Roberts explained to him that it would not be possible to implement the UMC recommendations within the current medication system at the USP.  (Dr. Roberts declaration ¶ 13.)

14. The USP medication system is set up so that inmates who need daily medication, including diabetics, receive their medication at a morning and evening pill line.  These pill lines do not occur at mealtime.  (Dr. Roberts declaration ¶ 14.)

15. The inmate checks his blood sugar level at the pill line, where a med tech can verify the reading, and then the inmate is given an insulin dosage within a prescribed range, as modified by the blood sugar reading.  (Dr. Roberts declaration ¶ 15.)

16. In order to carry out the recommendations that UMC had made, Losee needed to check his blood sugar before each meal and at bedtime.  Losee then needed to administer the Humalog insulin just before eating the meal (ideally), or immediately after the meal. (*See* Dr. Chamberlain's Clinic Note, June 1, 2007, attached to Losee's Complaint as Exhibit 1.)

17. At that time, Dr. Roberts believed the only way to carry out the recommendations that UMC had made would be to have Losee admitted to and remain in the USP infirmary.  (Dr. Roberts declaration ¶ 17; Losee/USP Medical 000167.)

18. Losee would be able to have his meals in the infirmary and could check his blood sugar just before eating; medical personnel would be able to dose his insulin right before his meal, and he could check his blood sugar at night.  (Dr. Roberts declaration ¶ 18.)

19. Dr. Roberts did not discuss this option with Losee on June 12, 2007, because Dr. Roberts believed Losee would not want to be admitted to the infirmary and Dr. Roberts felt certain he would reject the arrangement.  Losee, in fact, indicated that he was very happy with his current housing. Dr. Roberts informed Losee that he would discuss the UMC recommendations with the medical director, Dr. Garden.  (Dr. Roberts declaration ¶ 19; Losee/USP Medical 000167.)

20. On June 14, 2007, Losee filed out a Health Care Request form (HCR).  Losee directed the request specifically to Dr. Garden, stating, "I met with Dr. Roberts  yesterday and am asking that you not move me out of O5" [Oquirr 5 housing unit].  Believe I can better control my diabetes here. . . . . " (Losee/USP Medical 000162.)

21. On July 17, 2007, Dr. Roberts ordered Losee to have an electrocardiogram performed at the infirmary, because his blood work showed an elevated potassium level.  Medical staff conducted the electrocardiogram, which showed no abnormalities that could be attributed to high potassium levels.  The test showed normal sinus rhythm, meaning no arrhythmia.   (Dr. Roberts declaration ¶ 21; Losee/USP Medical 000102.)

22. On July 18, 2007, Dr. Roberts ordered Losee put on a low potassium diet.  (Dr. Roberts declaration ¶ 22;Losee/USP Medical 000098-99.)

23. On July 31, 2007, Dr. Roberts met with Losee again to discuss treatment options for his diabetes.  They discussed his high potassium levels, and Dr. Roberts told him he

would be put on a low potassium diet. Dr. Roberts reminded him that proper diet is an important part of controlling diabetes.  Losee said that he ate very little from the commissary.  (Dr. Roberts declaration ¶ 23; Losee/USP Medical 000304.)

24. Dr. Roberts discussed dietary issues with Losee because diabetics should not consume foods with simple sugars, because it causes spikes in blood sugar, which can be very dangerous.  Consuming candy and sugary snacks makes it extremely difficult to manage a diabetic who is not able to take insulin each time he eats foods with high sugar. (Dr. Roberts declaration ¶ 24.)

25. Losee's commissary records show, in fact, that he was consuming many inappropriate foods.  For example, on July 10, 2007, the commissary records show Losee purchased:  1 20 oz Pepsi, 1 20oz Strawberry Jelly, 1 Nutty Bar, 1 Brownie, 2 Iced Oatmeal cookies, 1 3 musketeers bar, 2 Reeses Peanut Butter Cups, and 1 Kingsize M&M plain.  (Losee/USP 001219.) And on July 24, 2007, Losee purchased 1 20 oz Pepsi, 1 pound sugar cubes, and 1 Nutty Bar.  (001217.)

26. During the July 31, 2007 visit with Losee, Dr. Roberts also discussed with him the UMC insulin recommendations. Dr. Roberts explained that in his opinion, the only possible way to implement the recommendation was to admit him to the infirmary, where he could receive Humalog immediately before meals and at bedtime, as required.   Losee said he was happy with his housing, and did not want to be admitted to the infirmary. (Dr. Roberts declaration ¶ 27; Losee/USP Medical 000304.)

27. Dr. Roberts suggested that one option to explore would be having Losee come to the infirmary at mealtime and getting his own glucometer so that he could check his

insulin levels himself. Dr. Roberts noted in his chart notes that he would discuss with custody the possibility of Losee coming to the infirmary for his insulin at mealtimes. (Dr. Roberts declaration ¶ 28; Losee/USP Medical 000304.)

28. On August 1, 2007, Losee's potassium levels were re-tested, and Dr. Roberts reviewed the test results. The test showed high potassium levels, but not as high as the previous levels. Before being incarcerated at the USP, Losee had been at the Adult Detention Center, where his potassium levels were also reported to be high. Dr. Roberts concluded that Losee's high potassium levels were likely a chronic condition for him, and one that he tolerated fairly well. (Dr. Roberts declaration ¶ 29; Losee/USP Medical 000296.)

29. Losee was scheduled to visit the UMC nephrology department on August 10, 2007, so Dr. Roberts decided to wait for their recommendation before making any changes in Losee's medications. (Dr. Roberts declaration ¶ 30; Losee/USP Medical 000296.)

30. On August 9, 2007, Dr. Roberts ordered that Losee be given a medical clearance pass to go to the infirmary three times a day within 30 minutes of each meal so that he could receive his insulin shot. (Dr. Roberts declaration ¶ 31; Losee/USP Medical 000284.)

31. The arrangement was not ideal, since security concerns prevented Losee from coming to the infirmary at night, and UMC had recommended a night-time blood sugar check. (Dr. Roberts declaration ¶ 32.)

32. On August 10, 2007, Mr. Losee attended the consultation appointment at UMC that Dr. Roberts ordered.  Losee saw Dr. Border, who noted in his report that putting Losee on a low potassium diet was appropriate; Dr. Border also noted that Losee had had a history of poor control of his diabetes.  He recommended medication to help Losee excrete potassium, but did not recommend any other changes in Losee's medication program.  (Dr. Roberts declaration ¶ 33; Losee/USP 1049.)

33. On August 12, 2007, Losee's blood sugar was 497 after breakfast.  (USP/Losee 000270.)

34. A reading of 497 is very high and potentially very dangerous.  The ideal range for a diabetic's blood sugar before eating a meal is from 70 to 130.  Anything above 200 is concerning, because once the blood sugar level hits 200, the kidneys do not have the capacity to reabsorb the sugar in urine.  (Dr. Roberts declaration ¶ 35.)

35. Chronic high blood sugar levels can lead to damaged retinas, which may cause blindness, damage to the kidneys, and damage to the nerves.  Nerve damage from high blood sugar levels is the leading cause of foot wounds and ulcers, which often lead to foot and leg amputations.  (Dr. Roberts declaration ¶ 36.)

36. Dr. Roberts met with Losee on August 15, 2007, three days after the over-400 a.m. blood sugar level, to discuss with him how to get his diabetes under control. Dr. Roberts discussed with Losee the possibility of his being transferred to Weber County Jail.  They have a higher staff-inmate ratio and Losee would be likely be able to be housed in the general inmate population—which is what he wanted—while still having his blood sugar checked four times a day, as recommended by UMC.  Losee said he did

8

not want to move to Weber County Jail.  (Dr. Roberts declaration ¶ 37; USP/Losee 000231.)

37. On August 24, 2007, Dr. Roberts saw Losee so that he could review his blood sugar levels with him.  He informed Dr. Roberts that he was happy with the current arrangement, and that his blood sugar had been ranging from 20 to 105 in the morning. He did say that at noon on that day (August 24, 2007) his blood sugar was 228, but he explained the high reading was because he had mis-counted his carbs in dosing his insulin after breakfast.  (Dr. Roberts declaration ¶ 38; Losee/USP 000231.)

38. Dr. Roberts told Losee that he could continue with the current system.  (Dr. Roberts declaration ¶ 39; Losee/USP 000231.)

39. On August 27, 2007, Losee had another high blood sugar reading—this time it was 435 after breakfast.  (Losee/USP 000225.)

40. On August 28, 2007, Losee had a follow-up visit with the UMC Diabetes Clinic. He informed Dr. Chamberlain that he was doing well and that his blood sugar levels were 80 to 200 and that he was feeling better overall.  He reported to Dr. Chamberlain that he had access to insulin in his cell, and was able to dose with insulin before each meal and at bedtime.  (Losee/USP 0001046-47.)

41. Losee did not have access to insulin in his cell, however.  He was still at that time coming to the infirmary and taking his insulin after meals.  Losee had consistently insisted that he did not want to take the insulin before eating; rather, he preferred eating his meal, then taking his insulin.  (Dr. Roberts declaration ¶ 42.)

42. On September 7, 2007, Dr. Roberts met with Losee to discuss with him his consult with UMC.  At that time, Dr. Roberts recommended to him that he be admitted to the infirmary, so he could have his blood sugar checked and take his insulin *before* meals and at bedtime, which is what UMC had ordered. Dr. Roberts believed that if the prison medical staff implemented the UMC recommendations exactly, they might better be able to regulate Losee's blood sugar levels.  (Dr. Roberts declaration ¶ 43; Losee/USP 000196.)

43. Losee refused to be admitted to the infirmary, and said he was happy with the way things were going.  (Losee/USP 000196.)

44. Losee signed an Against Medical Advice (AMA) form, stating that he was refusing Dr. Roberts' advice that he be admitted to the infirmary.  (Losee/USP 000196.)

45. On August 13, 2007, Losee reported to the med tech that his blood sugar level was 65, but when the med tech checked, it was actually 151.  (Losee/USP 000427.)

46. On September 18, 2007, Dr. Roberts changed Losee's order to require him to have his blood sugar checked *before* meals, and his insulin administered *before* meals, and *at bedtime*.  By making this order, Dr. Roberts was implementing exactly what UMC had recommended.  (Dr. Roberts declaration ¶ 47; Losee/USP 000404.)

47. Dr. Roberts made this change because he had serious concerns about Losee's renal function.  As Dr. Roberts noted in his chart entry, Losee had continued to have renal failure.  He had also had fluctuating blood sugars, at times dangerously high. Dr. Roberts was concerned about Losee's health, and hoped that if the prison medical staff

implemented UMC's recommendations exactly, they might better be able to control Losee's diabetes.  (Dr. Roberts declaration ¶ 48.)

48. Due to Losee's deteriorating condition, Dr. Garden staffed Losee's case with a team of health care providers.  The group concluded that Losee might benefit from being housed in the special needs area of Olympus.  (Dr. Garden declaration ¶¶ 23-24.)

49. The Olympus special needs section has its own nursing station, and also holds multiple pill lines and receives more frequent visits from medical staff, including night time visits if necessary. (Dr. Garden declaration ¶ 23.)

50. The medical staff believed that they could more carefully monitor Losee's blood sugar, and ensure that it was checked immediately before meals, with the appropriate insulin dosage given based on calories in the meal, and checked at bedtime, if he were in Olympus.  (Dr. Garden declaration ¶ 24.)

51.  Olympus was the only housing option for Losee, other than the infirmary, that would allow him to receive his insulin four times a day, as recommended by UMC.  With his refusal to reside in the infirmary medical was hopeful this housing area would be ideal.  Ultimately, the decision was made to move Losee in hopes of improving his diabetic condition.  (Dr. Garden declaration ¶¶ 25-26.)

52. The decision to move Losee was made without Dr. Roberts' input.  (Dr. Roberts declaration ¶ 52.)

53. Losee was very unhappy at Olympus, and reported to medical staff that he believed he had been housed with the mentally ill illegally, in retaliation for his filing grievances.  The nurse encouraged him to get control of his blood sugar while he was in

Olympus.  Losee said this would never happen because of the stress he felt from being

housed there.  He was encouraged to discuss his concerns with his therapist.  (Losee/USP

000497.)

54. Shortly after September 21, 2007, Dr. Garden  received a letter addressed "To

Whom It May Concern" from Dr. Chamberlain.  A copy of the letter is attached to

Losee's complaint at Exhibit 1.  (Dr. Garden declaration ¶ 28.)

55. In the letter, Dr. Chamberlain notes that Losee had been moved in to a special

needs unit, and Dr. Chamberlain suggests that Losee's diabetes would be better

controlled if he were moved back to his prior placement.  (Dr. Garden declaration ¶ 29.)

56. Dr. Garden responded to the letter on or about October 15, 2007.  A copy of the

letter was scanned in to Losee's M-Track files.  (Dr. Garden declaration ¶ 30; Losee/USP

1037-38.)

57. Dr. Garden explained that Losee's diabetes was better controlled now than it had

been before he was incarcerated.  He also explained that he believed that at least part of

the reason Losee's diabetes was not optimally controlled was that Losee was not

maintaining a proper diet, exercise, etc.   (Dr. Garden declaration ¶ 31; Losee/USP

001037-38.)

58. Dr. Garden did not believe that Dr. Chamberlain was getting a complete or

accurate picture of the care the prison was providing and of what Losee was/was not

doing to control his diabetes.  (Dr. Garden declaration ¶ 32' Losee/USP 001037-38.)

59. Dr. Garden invited Dr. Chamberlain to contact him directly if he had concerns or wished to discuss our efforts to adequately treat Losee's diabetes.  (Dr. Garden declaration ¶ 33; Losee/USP 001037-38.)

60. On October 25, 2007, Dr. Garden met with Losee's therapist, Mike Hoglund.  Dr. Garden documents in the records that Olympus is the only housing unit, other than the infirmary, where Losee could get his insulin four times.  Dr. Garden reported that he had hoped the move to Olympus would allow medical to help Losee better control his diabetes, but if Losee does not buy into the process, he could make it worse.  (Dr. Garden declaration ¶¶ 34-35; Losee/USP 000490-91.)

61.  Dr. Garden and Hoglund met with Losee twice on October 25, 2007, and informed him of their recommendations and the medical risks of moving back to Oquirr 5.  Losee expressed his strong preference to move back to Oquirr 5 and his belief that he could better control his diabetes there.  (Dr. Garden declaration ¶¶ 34-36;  Losee/USP 00490-91.)

62. The decision was ultimately made to allow Losee to move back to Oquirr 5, after he signed an AMA form.  Losee moved back to Oquirr 5 on or about November 9, 2007. (Losee/USP 433-34.)

## ARGUMENT

Defendants are entitled to qualified immunity because Losee cannot show that they violated his Eighth Amendment right to be free from cruel and unusual punishment. "Qualified immunity is designed to shield public officials from liability and ensure that erroneous suits do not even go to trial." *Oliver v. Woods,* 209 F.3d 1179, 1185 (2000)

(quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)).   Once raised by a defendant, qualified immunity is a rebuttable presumption, and the Plaintiff's burden is to establish, first, that the defendant's actions violated a specific constitutional right.   *Oliver*, 209 F.3 at 1185 (*quoting Albright*, 51 F.3d at 1534).   And, second, Plaintiff must show the court that the right was clearly established when the alleged violation occurred.   In this case, Losee cannot show that Defendants were deliberately indifferent to his medical needs.   On the contrary, the undisputed facts show that Dr. Roberts, Dr. Garden, and Dr. Tubbs provided excellent, attentive care to Losee.

 The Eighth Amendment's ban on cruel and unusual punishment requires prison officials to "provide humane conditions of confinement" including "adequate food, clothing, shelter, and medical  care . . . ."  *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998)) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998)).   To state a cognizable claim under the Eighth Amendment for failure to provide medical care "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).   Deliberate indifference is manifested only when prison officials "intentionally interfere with treatment once prescribed."  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (emphasis added). In clarifying the deliberate indifference standard, the United States Supreme Court has held that a prison official cannot be found deliberately indifferent under the Eighth Amendment, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brenna*n, 511 U.S. 825, 837 (1970) (emphasis added).

It is well established that the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state law tort claims which are otherwise barred. *Estelle*, 429 U.S. at 106. Not every lapse in prison medical care will rise to the level of a constitutional violation. *Id.* In *Estelle v. Gamble*, the United States Supreme Court held that "deliberate indifference" entails more than mere negligence. 429 U.S. 97, 106 (1976). A prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. *See, e.g., Estelle*, 429 U.S. at 105-06.

After screening, Losee's only claims against Defendants are that (1) they refused to implement the UMC recommendations for treating Losee's diabetes, (*see* Memorandum Decision, Docket 19, at 6), and (2) they failed to promptly treat Losee's potassium imbalance, allegedly causing a heart arrhythmia.  (*See id.* at 11.)  Thus, to survive summary judgment, Losee must show, on the first claim, that the Doctors "intentionally interfere[d] with,"  *Estell*, 429 U.S. at 105, the UMC treatment plan.  And on the second claim, Losee must show that the Doctors did more than inadvertently fail to provide proper care for his high potassium levels.  Losee cannot make either showing.

The medical records and testimony plainly show that the Doctors worked hard to ensure the UMC recommendations were properly implemented, and that the Doctors quickly identified and promptly treated Losee's potassium imbalance.

I.       DR. TUBBS APPROPRIATELY PRESCRIBED INSULIN
         AND ORDERED SCREENING TESTS FOR LOSEE WHEN
         HE FIRST ARRIVED TO THE PRISON.

Dr. Tubbs should be dismissed from Losee's lawsuit because he simply

prescribed insulin to Losee—based on what Losee had been getting at the county jail—

and ordered screening tests.  (*See* Tubbs declaration ¶¶ 6-9.)  Dr. Tubbs had no other

involvement in Losee's care.  Soon after Losee arrived at the prison, he was sent to UMC

and their recommendations were implemented, as best as they could be implemented in

the prison setting.  (*See* Roberts declaration ¶¶ 14-17.)  Dr. Tubbs had no involvement in

Losee's care after Losee saw the UMC specialist.  (Tubbs declaration ¶ 9.)  Dr. Tubbs

also had no involvement in managing Losee's potassium levels.  (Tubbs declaration ¶ 9.)

Losee's claims that Dr. Tubbs failed to implement the UMC recommendations

and failed to treat his high potassium levels are unsupported by the record.  Dr. Tubbs

was not involved in Losee's care, and Losee's medical neglect lawsuit against him

therefore fails as a matter of law.

II.      DR. ROBERTS IMPLEMENTED THE UMC
         RECOMMENDATIONS AND PROMPTLY TREATED
         LOSEE'S ELEVATED POTASSIUM LEVELS.

Dr. Roberts worked diligently to control Losee's diabetes, and did everything he

could within the prison's administrative and security limitations to implement the UMC

recommendations.   Dr. Roberts also immediately took steps to control Losee's high

potassium, by first testing him for potassium levels, then putting Losee on a low-

potassium diet, and finally sending him to a specialist, who noted that Dr. Roberts had

treated the elevated potassium appropriately.    As with Dr. Tubbs, Losee's claims against

Dr. Roberts are simply not supported by the record evidence.

> ### a.  Dr. Roberts Attempted To Implement The UMC Recommendations, But Losee Refused To Be Housed Where The Recommendations Could Best Be Put In Place.

Losee's medical records and Dr. Roberts' declaration make it plain that Dr.

Roberts did everything he could to manage Losee's diabetes, including trying to

implement the UMC recommendations exactly.  Ultimately, Losee himself made it

virtually impossible for Dr. Roberts and the prison medical staff to effectively treat his

diabetes.

Dr. Roberts was Losee's primary care physician, and he saw Losee soon after

Losee was admitted to the prison.  (Dr. Roberts declaration ¶¶ 3, 7-8; Dr. Garden

declaration ¶ 8.)  When Losee arrived in April 2007, he had a history of brittle, or

extremely difficult to control, diabetes.  (Dr. Garden declaration 6-7.)  Dr. Roberts

immediately put in a request that Losee be seen by the University of Utah Diabetes

Clinic.  (Dr. Roberts declaration ¶10; Dr. Garden declaration ¶ 9.)  Dr. Roberts saw Losee

a few days later, on May 4, 2007, and ordered a complete panel of blood tests to be sure

Losee was not suffering from any complications and to be sure medical had accurate

baseline data in order to properly treat Losee.  (Dr. Roberts declaration ¶ 8.)  Dr. Roberts

saw Losee for follow up a week later, and discussed making changes to Losee's insulin.

(Dr. Roberts declaration ¶ 9.)

Losee saw Dr. Chamberlain at the University of Utah Diabetes Clinic on June 1,

2007.  (Losee/USP Medical 1062.)    Dr. Roberts met with Losee on June 12, 2007 to

discuss implementing the UMC recommendations.  (Dr. Roberts declaration ¶ 13.)  UMC had recommended that Losee take Lantis and Humalog insulin.  Humalog is ultra-fast acting, and must be administered immediately before or after each meal; the dosage is calculated based on the calorie-content of the meal.  (Dr. Roberts declaration ¶ 12.)   Dr. Roberts discussed with Losee that he did not think it would be possible to implement the UMC recommendations within the security and medical structure at the prison.  (Dr. Roberts declaration ¶ 12; Losee/USP Medical 167.)

The prison distributes medications to inmates, including insulin for diabetic inmates, during a "pill line" which occurs twice a day, in the morning and evening.  Pill line does not occur at the same time as prison meals.  (Dr. Roberts declaration ¶¶14-16; Dr. Garden declaration ¶¶16-18.)  Dr. Roberts believed the only way to control Losee's diabetes would be to house him in the infirmary, where medical staff could distribute the insulin promptly at meal time, and where he could also receive the bedtime insulin dose that UMC had recommended.  (Dr. Roberts declaration ¶¶ 17-18.)  Dr. Roberts did not discuss this with Losee, because he did not believe Losee would agree to be housed in the infirmary.  (Dr. Roberts declaration ¶ 19.)  Losee, in fact, did not want to change his housing and specifically requested that he be allowed to stay in Oquirr 5.  (Losee/USP 162.)

Dr. Roberts  met with Losee again on July 31, 2007 to discuss treatment options with him.  At that time, Roberts did recommend to Losee that he be housed in the infirmary and explained that in his medical opinion it was the only housing that would allow the UMC recommendations to be precisely followed.  (Dr. Roberts declaration ¶

23; 27.)  Losee told Dr. Roberts he was happy with his housing and did not want to move. (Losee/USP Medical 304.)  Dr. Roberts suggested it might be possible for Losee to come to the infirmary at mealtimes, and have his insulin dosed then; he told Losee he would discuss this option with prison security.  (Dr. Roberts declaration 28; Losee/USP Medical 304.)

Security approved Dr. Roberts' request, and he put in a medical clearance order on August 9, 2007, allowing Losee to go to the infirmary at meal times for his insulin shot.  (Dr. Roberts declaration 31; Losee/USP Medical 284.)  The arrangement was not ideal, since UMC had also recommended a bedtime insulin dose, and security concerns would not allow an inmate to go to the infirmary at night.  (Dr. Roberts declaration ¶ 32.)

But Losee's diabetes remained poorly controlled, and he had dangerous, fluctuating blood sugar levels.  Losee's blood sugar levels were as high as 497, and several checks showed levels above 200.  (Dr. Roberts declaration ¶¶ 34-36.)  Such levels pose serious health risks, including damage to the retinas, which can lead to blindness, damage to the kidneys, and damage to nerves.  (Dr. Roberts declaration ¶¶ 35-36.)  Dr. Roberts met with Losee on August 24, 2007 to discuss his concerns about Losee's blood sugar levels.  Losee told Dr. Roberts he was happy with the current arrangement.  (Dr. Roberts declaration  ¶ Losee/USP 231.)

But Losee continued to have high blood sugar readings.  (Losee/ USP 225.)  On September 7, 2007, Dr. Roberts met with Losee and recommended that he be admitted to the infirmary so that medical staff would have the best opportunity to get Losee's diabetes under optimal control.  (Dr. Roberts declaration 43; Losee/USP 196.)  Losee

refused, and signed an "Against Medical Advice" or AMA form.  (Dr. Roberts declaration 196.)

Ultimately, the decision was made to place Losee in Olympus special needs housing.  (Dr. Garden declaration ¶¶ 21-23.)  Concerned about Losee's condition, Dr. Garden staffed Losee's case with a team of medical professionals.  The group decided to that Losee could get better care at Olympus, which has its own nursing station and holds multiple pill lines.  (Dr. Garden declaration 23; Dr. Roberts declaration 53.)   The team believed Olympus was the only housing option, other than the infirmary, that would allow the UMC recommendations to be implemented precisely, because Losee could be dosed immediately before meals there and he could receive night time insulin.  (Dr. Garden declaration ¶¶ 23-25.)  Dr. Roberts was not consulted on making this move.  (Dr. Roberts declaration ¶ 52.)

Losee was very unhappy in Olympus housing, which houses mentally ill and other special needs inmates.  (Losee/USP 497.)  The nurses encouraged Losee to discuss his concerns with his therapist.  (Losee 497.)  Ultimately, after several meetings between nursing, Losee's therapist, and Dr. Garden, the decision was made that Losee could return to his previous housing, so long as he understood it was against medical advice and he signed an AMA form.  (Losee/USP 490-91; 433-34; Dr. Garden declaration ¶ 37.)

These facts clearly demonstrate that Dr. Roberts was not indifferent to Losee's diabetes.  On the contrary, Dr. Roberts worked hard to get Losee's diabetes under control, and he did his best to implement the UMC recommendations.

**b. Dr. Roberts Promptly And Appropriately Treated Losee's Potassium Imbalance.**

Dr. Roberts also was not indifferent to Losee's high potassium levels and that claim cannot survive summary judgment. The medical records and Dr. Roberts' testimony show he treated Losee's potassium imbalance promptly and appropriately.

The first time Dr. Roberts saw Losee, he ordered a complete blood work up to be sure that medical staff had proper baseline data for treating Losee's diabetes and any underlying conditions. (Dr. Roberts declaration ¶ 8; Losee/USP 63.) When those tests showed high potassium levels, Dr. Roberts ordered that Losee have an electrocardiogram, to determine if the potassium levels were affecting Losee's heart. (Dr. Roberts declaration ¶ 21; Losee/USP Medical 102.) That test showed no abnormalities, specifically no sinus rhythm, which means no arrhythmia. (Dr. Roberts declaration ¶ 21; Losee/USP Medical 102.) Dr. Roberts immediately put Losee on a low potassium diet. (Dr. Roberts declaration ¶ 22; Losee/USP Medical 98-99.) Dr. Roberts re-tested Losee's potassium levels, which were not as high the second time. (Dr. Roberts declaration 29l Losee/USP Medical 296.) Nonetheless, Losee was referred to the University of Utah nephrology department for a consult. (Dr. Roberts declaration ¶ 30; Losee/USP Medical 286.) Losee saw Dr. Border at UMC, who noted that putting Losee on the low potassium diet was appropriate. He ordered medication to help Losee secrete potassium, but ordered no other changes to his medication. (Dr. Roberts declaration; Losee/USP 1049.)

Losee's records do not show any arrhythmia. And the records show Dr. Roberts promptly and appropriately treated Losee's high potassium levels. Losee's claim against

Dr. Roberts based on alleged failure to treat Losee's potassium imbalance fails as a matter of law.

> ### III.    Dr. Garden Appropriately Moved Losee to Special Needs Housing In Order To Fully Implement UMC's Recommendations And Was Never Indifferent To Losee's Medical Needs.

Dr. Garden did not fail to implement the UMC recommendations; rather, he, in consultation with other prison medical professionals, decided to change Losee's housing in order to better implement the UMC regime.  The record shows that Dr. Garden, like Dr. Roberts, was trying to provide Losee the best care under the circumstances.

> #### a.    Dr. Garden Attempted To Implement the UMC Recommendations When He Decided Losee Should Be Moved To Special Housing.

Dr. Garden's involvement in Losee's care was limited, and was focused only on ensuring that Losee's diabetes was controlled as best as possible within the prison system.

Dr. Garden first became aware of Losee's case when he was contacted by Losee's sentencing judge, who was aware that Losee's diabetes had been very poorly controlled while Losee was at the Adult Detention Center.  (Dr. Garden declaration ¶ 6.)  Dr. Garden met with Losee, at Losee's request, on June 1, 2007, to discuss Losee's diabetes. Dr. Garden discussed housing options with Losee, and told Losee that he would recommend that he be housed in Oquirr 5, where geriatric and disabled inmates are housed.  (Dr. Garden declaration ¶¶ 10-11.)  At that time, Losee had not yet attended the UMC consult, so Dr. Garden did not know those recommendations.  (Dr. Garden

declaration ¶ 11.)  Dr. Garden got special permission from custody to have Losee placed in Oquirr 5.  (Dr. Garden declaration ¶ 13.)

Dr. Garden did not become directly involved in Losee's case again until a few months later, when it became clear that Losee's diabetes was not being ideally controlled. (Dr. Garden declaration ¶ 21.)  Dr. Garden staffed Losee's case with a team of medical professionals from the prison who decided that the best housing option for Losee—other than the infirmary—would be Olympus special housing.  (Dr. Garden declaration ¶¶ 22-25.)  The decision was made to move lose to Olympus because that housing unit had better access to health care than the others.

Soon after Losee was moved to Olympus, however, it became clear that he was very unhappy.  (Losee/USP 433-34.)  Shortly after September 21, 2007, Dr. Garden received a letter addressed "To Whom It May Concern," that was written by Dr. Chamberlain.  Dr. Chamberlain indicated in the letter that he understood Losee had recently been moved to a special needs housing unit, and suggested that Losee's diabetes could be better managed if Losee were moved back to his prior housing.  (Dr. Garden declaration ¶¶ 28-29.)  Dr. Garden responded to Dr. Chamberlain's letter by explaining that Losee's diabetes was better controlled now than it had been before he was incarcerated.  He also explained that Losee's diabetes was not fully controlled in part because Losee was not maintaining a proper diet, exercise, etc.  Dr. Garden also expressed to Dr. Chamberlain that Dr. Chamberlain was not getting an accurate picture from Losee on the care he was receiving.  Dr. Garden invited Dr. Chamberlain to contact him directly if he had any concerns or wished to discuss Losee's treatment.  (¶¶28-33.)

A few weeks later, on October 25, 2007, Dr. Garden met with Mike Hogland, Losee's therapist, to discuss Losee's complaints about being housed in Olympus. Although Dr. Garden had originally hoped Losee would work with Olympus housing to get his diabetes under control, he became worried after talking with Hoglund that Losee might try to sabotage his care because he was so unhappy at Olympus.  Dr. Garden concluded that without Losee's cooperation, his diabetes would not get better and might get worse.  (Dr. Garden declaration 34-35.)  After staffing the case again, Dr. Garden decided Losee could be moved back to Oquirr 5, if he signed an AMA form.  (Dr. Garden declaration 37.)

The record shows Dr. Garden made decisions aimed at trying to fully implement the UMC recommendations and getting Losee's diabetes under better control.  He was not indifferent to Losee's medical needs.

### b.  Dr. Garden Was Not Directly Involved In Managing Losee's Potassium Imbalance.

As set out in section II.b., above, Dr. Roberts treated Losee for his high potassium levels.  Dr. Garden was not directly involved in that treatment, which was timely and appropriate.  He cannot therefore be held liable for medical neglect based on Dr. Roberts' treatment of Losee's potassium levels.

### CONCLUSION

Based on the foregoing, Dr. Tubbs, Dr. Garden, and Dr. Roberts are all entitled to qualified immunity.  Losee cannot meet his burden of showing that they violated his Eighth Amendment rights, and thus Losee's civil rights lawsuit should be dismissed, with prejudice.

24

DATED this 10th day of  August, 2008.

MARK L. SHURTLEFF
Utah Attorney General


  /s/ Joni J. Jones_____
JONI J. JONES
Assistant Utah Attorney General
Attorney for Defendants

## CERTIFICATE OF MAILING

I certify that on August 10, 2009, I electronically filed the foregoing,

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY**

**JUDGMENT**, using the Court's CM/ECF system and I also certify that a true and

correct copy of the foregoing was sent by United States mail, postage prepaid, on August

11, 2009 to the following:

Karl Grant Losee, USP 41156
Utah State Prison
P.O. Box 250
Draper, UT 84020

                                    /s/ Joni J. Jones