**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| KARL GRANT LOSEE, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | Case No. 2:07-CV-911 DB |
| RICHARD GARDEN et al., | District Judge Dee Benson |
| Defendants. | |

Plaintiff, Karl Grant Losee, an inmate at the Utah state Prison, filed this *pro se* civil rights suit under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2010). Plaintiff was allowed to proceed *in forma pauperis* under 28 U.S.C. § 1915(b). *See* 28 *id*. 1915. Before the court is Defendants' motion for summary judgment.

### ANALYSIS

### I. Background

Plaintiff brought this suit against numerous officials at the Utah State Prison alleging a variety of civil rights claims, including denial of access to the courts, retaliation, and several counts of cruel and unusual punishment based on inadequate medical care. On screening under 28 U.S.C. § 1915(e) the court dismissed all defendants except Richard Garden, M.D.,

Sydney Roberts, M.D., and Kennon Tubbs, M.D.; the court also dismissed all of Plaintiff's claims except his Eighth Amendment claims for failure to properly treat his diabetes and failure to properly treat a potassium imbalance which allegedly caused a heart arrhythmia. (Dkt. no. 20.) The United States Marshals Service completed service of process upon the remaining defendants. After filing their Answer, Defendants were directed to file a *Martinez* report addressing Plaintiff's claims.[1] The *Martinez* Report was filed on June 10, 2009, and includes Defendants' sworn declarations and Plaintiff's extensive prison medical and commissary records. (Dkt. nos. 60, 66-67, 71-73).

On August 10, 2009, Defendants filed the present motion for summary judgment based on the evidence presented in their *Martinez* Report. Plaintiff promptly filed a general response to the summary judgment motion stating that he was unable to fully respond without additional discovery.[2] (Dkt. no. 81.) Plaintiff later filed a variety of motions including motions to compel discovery and a motion in limine seeking to exclude his

---

[1] In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), the Tenth Circuit approved the practice of district courts ordering government officials to prepare a report to be included with the pleadings in cases where a prisoner alleges a constitutional violation by such officials.

[2] Plaintiff's initial response was incorrectly captioned and docketed as a motion to dismiss.

commissary records as evidence.  After resolving Plaintiff's discovery and evidentiary motions the court granted Plaintiff additional time to file his supplemental summary judgment response, which was filed on May 27, 2010.  (Dkt. no. 98.) Defendants' summary judgment motion is now fully briefed and properly before the court.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."  *Cellotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986).  Thus, Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move "with or without supporting affidavits for a summary judgment in the party's favor upon all or any part of [a claim]."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case."  *Cellotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the

3

record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* Federal Rule of Civil Procedure 56(e) requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998). The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). Mere allegations and references to the pleadings will not suffice. However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### III. Facts

1. Karl Grant Losee is an inmate at the Utah State Prison

(USP) who has a history of very difficult to control, or "brittle," diabetes. (Garden Decl. ¶ 7, Docket No. 72)

2. Losee arrived at USP on April 4, 2007, after being transferred from the Salt Lake County Adult Detention Center (ADC). (Losee USP Med. R. at 1.)

3. While at ADC Losee was receiving Lantus insulin and Humalog insulin. (Losee/ADC Medical p. 2, Docket No. 85.)

4. Humalog is an ultra fast-acting insulin that must be administered immediately before or after mealtimes. The dosage is calculated based on the calorie content of the meal the patient eats. (Roberts Decl. ¶ 12, Docket No. 71.)

5. Dr. Tubbs is a physician who did the initial medical screening of Losee upon his arrival at USP. (Tubbs Decl. ¶ 6, Docket No. 73.)

6. Based on his initial screening, Tubbs prescribed a new insulin regimen for Losee that included Lantus insulin and "regular insulin," which is a short-acting insulin. Tubbs did not continue Losee's prescription for Humalog insulin. (Tubbs Decl. ¶¶ 7-8; Roberts Decl. ¶ 7; Losee USP Med. R. at 47, 66.)

7. Dr. Tubbs had no other involvement in Losee's care. (Tubbs Decl. ¶ 9.)

8. Dr. Garden is the Administrative and Clinical Director over health services for the Utah Department of Corrections.

(Garden Decl. ¶ 2, Docket No. 72.)

9.  Dr. Garden first became aware of Losee in April of 2007 when he received a call from Losee's sentencing Judge regarding the difficulty Losee had managing his diabetes at ADC.  (Garden Decl. ¶ 6)

10.  Although Dr. Garden was not Losee's primary care physician during the time period at issue in this lawsuit, as medical director Dr. Garden worked with other medical and security personnel to ensure proper medical care for Losee. (Garden Decl. ¶ 8.)

11.  Dr. Roberts was Losee's primary care physician and handled most of Losee's treatment during the time period at issue in this lawsuit.  (Garden Decl. ¶ 8.)

12.  On April 27, 2007, Dr. Roberts put in a request for Losee to be evaluated at the University of Utah Medical Center (UMC) for his diabetes.  (Roberts Decl. ¶ 10)

13.  On May 4, 2007, Dr. Roberts saw inmate Losee.  At that time, Losee was still receiving Lantus insulin and regular insulin, as prescribed by Dr. Tubbs.  (Roberts Decl. ¶ 7; Losee USP Med. R. at 47, 66.)

14.  On May 4, 2007, Dr. Roberts ordered a complete blood test in order to monitor Losee's diabetic control and evaluate him for any complications.  Dr. Roberts ordered these tests

because Losee was a new inmate and the medical staff needed baseline data in order to effectively treat and monitor his diabetes. (Roberts Decl. ¶ 8; Losee USP Med. R. at 63.)

15. On May 11, 2007, Dr. Roberts saw Losee for a followup visit. They discussed making some changes to his insulin. During the meeting, Losee stated matter-of-factly that his diabetes would not be controlled while he is in prison. (Roberts Decl. ¶ 9; Losee USP Med. R. at 47.)

16. Losee was evaluated at UMC on June 1, 2007. (Losee USP Med. R. at 1062.)

17. Dr. Chamberlain, the treating physician at UMC, recommended that Losee take Lantis and Humalog insulins. (Roberts Decl. ¶ 12.; Losee USP Med. R. at 1045.)

18. In order to carry out the UMC recommendations, Losee needed to check his blood sugar before each meal and at bedtime. Losee also needed to administer the Humalog insulin just before (ideally) or immediately after each meal. (Dr. Chamberlain's Clinic Note, June 1, 2007, Compl. Ex. 1.)

19. On June 12, 2007, Dr. Roberts discussed the UMC recommendations with Plaintiff, and Dr. Roberts explained to him that he could not implement the UMC recommendations within the current medication system at USP. (Roberts Decl. ¶ 13.)

20. The USP general population medication system is set up

so that inmates who need daily medication, including diabetics, receive their medication at a morning and evening pill line. These pill lines do not occur at mealtime. (Roberts Decl. ¶ 14.)

21. The inmate checks his blood sugar level at the pill line, where a med tech can verify the reading, and then the inmate is given an insulin dosage within a prescribed range, as modified by the blood sugar reading. (Roberts Decl. ¶ 15.)

22. Dr. Roberts believed the only way to fully implement the UMC recommendations would be to have Losee admitted to the USP infirmary. (Roberts Decl. ¶ 17; Losee USP Med. R. at 167.)

23. In the infirmary Losee would be able check his blood sugar just before eating and medical personnel would then be able to dose his insulin right before each meal; they could also check his blood sugar at night. (Roberts Decl. ¶ 18.)

24. Dr. Roberts did not discuss this option with Losee on June 12, 2007, because Dr. Roberts believed Losee would not want to be admitted to the infirmary. Dr. Roberts felt certain Losee would reject the arrangement because Losee indicated that he was very happy with his current housing. However, Dr. Roberts informed Losee that he would discuss the UMC recommendations with the medical director, Dr. Garden. (Roberts Decl. ¶ 19; Losee USP Med. R. at 167.)

25. On June 14, 2007, Losee filed a Health Care Request

form (HCR) directed specifically to Dr. Garden, stating, "I met with Dr. Roberts yesterday and am asking that you not move me out of O5 [Oquirrh 5 housing unit]. Believe I can better control my diabetes here . . . . " (Losee USP Med. R. at 162.)

26. On July 17, 2007, Dr. Roberts ordered Losee to have an electrocardiogram performed at the infirmary because his blood work showed an elevated potassium level. Medical staff conducted the electrocardiogram, which showed no abnormalities that could be attributed to high potassium levels. The test showed normal sinus rhythm, meaning no arrhythmia. (Roberts Decl. ¶ 21; Losee USP Med. R. at 102.)

27. On July 18, 2007, Dr. Roberts ordered a low potassium diet for Losee. (Roberts Decl. ¶ 22; Losee USP Med. R. at 98-99.)

28. On July 31, 2007, Dr. Roberts met with Losee again to discuss treatment options for his diabetes. They discussed his high potassium levels, and Dr. Roberts told him he would be put on a low potassium diet. Dr. Roberts reminded him that proper diet is an important part of controlling diabetes. Losee said that he ate very little from the commissary. (Roberts Decl. ¶ 23; Losee USP Med. R. at 304.)

29. Dr. Roberts discussed dietary issues with Losee including the fact that diabetics should not consume foods with simple sugars, because it causes spikes in blood sugar, which can

be very dangerous.  Roberts also explained that eating candy and sugary snacks make it extremely difficult to manage a diabetic who is not able to take insulin each time he eats high sugar foods.  (Roberts Decl. ¶ 24.)

30.  Losee's commissary records showed that he was purchasing many inappropriate foods at the time.  For example, commissary records show that on July 10, 2007, Losee purchased: 1 20 oz. Pepsi, 1 20 oz. Strawberry Jelly, 1 Nutty Bar, 1 Brownie, 2 Iced Oatmeal cookies, 1 3 musketeers bar, 2 Reeses Peanut Butter Cups, and 1 Kingsize M&M plain.  (Losee USP Commissary R. at 1219.)  And on July 24, 2007, Losee purchased 1 20 oz. Pepsi, 1 pound sugar cubes, and 1 Nutty Bar.  (Losee USP Commissary R. at 1217.)

31.  During his visit on July 31, 2007, Dr. Roberts discussed with Losee the UMC insulin recommendations.  Dr. Roberts explained that in his opinion, the only possible way to implement the recommendation was to admit Losee to the infirmary, where he could receive Humalog immediately before meals and at bedtime, as recommended.  Losee said he was happy with his housing, and did not want to be admitted to the infirmary. (Roberts Decl. ¶ 27; Losee USP Med. R. at 304.)

32.  Dr. Roberts suggested that one option to explore would be having Losee come to the infirmary at mealtime and getting his

own glucometer so that he could check his insulin levels himself.
Dr. Roberts noted in his chart notes that he would discuss with
security staff the possibility of Losee coming to the infirmary
for his insulin at mealtimes. (Roberts Decl. ¶ 28; Losee USP
Med. R. at 304.)

33. On August 1, 2007, Losee's potassium levels were re-
tested and Dr. Roberts reviewed the test results with him. The
test showed high potassium levels, but not as high as previously.
Roberts noted that Losee's potassium levels were also reportedly
high while at ADC. Dr. Roberts concluded that Losee's high
potassium levels were likely a chronic condition which Losee
seemed to tolerate fairly well. (Roberts Decl. ¶ 29; Losee USP
Med. R. at 296.)

34. Losee was scheduled to visit the UMC nephrology
department on August 10, 2007, so Dr. Roberts decided to wait for
their recommendation before making any changes to Losee's
medications. (Roberts Decl. ¶ 30; Losee USP Med. R. at 296.)

35. On August 9, 2007, Dr. Roberts ordered that Losee be
given a medical clearance pass to go to the infirmary three times
a day, within 30 minutes of each meal, so that he could receive
his Humalog insulin shot. (Roberts Decl. ¶ 31; Losee USP Med. R.
at 284.)

36. The arrangement was not ideal because UMC had also

recommended a night-time blood sugar check but security concerns prevented Losee from coming to the infirmary at night. (Roberts Decl. ¶ 32.)

37. On August 10, 2007, Losee attended the consultation appointment at UMC that Dr. Roberts ordered. Losee saw Dr. Border, who noted in his report that putting Losee on a low potassium diet was appropriate; he also noted that Losee had a history of poor control of his diabetes. Dr. Border recommended medication to help Losee excrete potassium, but did not recommend any other changes in Losee's medication program. (Roberts Decl. ¶ 33; Losee USP Med. R. at 1049.)

38. On August 12, 2007, Losee's blood sugar was 497 after breakfast, which was very high and potentially very dangerous. (Losee USP Med. R. at 270.)

39. The ideal range for a diabetic's blood sugar before eating a meal is from 70 to 130. Anything above 200 is concerning, because once the blood sugar level hits 200, the kidneys do not have the capacity to reabsorb the sugar in urine. (Roberts Decl. ¶ 35.)

40. Chronic high blood sugar levels can lead to damaged retinas, which may cause blindness, damage to the kidneys, and damage to the nerves. Nerve damage from high blood sugar levels is the leading cause of foot wounds and ulcers, which often lead

to foot and leg amputations.  (Roberts Decl. ¶ 36.)

41.  Dr. Roberts met with Losee on August 15, 2007, three
days after the over-400 a.m. blood sugar level, to discuss how to
get Losee's diabetes under control.  Dr. Roberts discussed with
Losee the possibility of a transfer to the Weber County Jail
which had a higher staff-inmate ratio.  There Losee could be
housed in the general inmate population while still having his
blood sugar checked four times a day, as recommended by UMC.
Losee said he did not want to move to Weber County Jail.
(Roberts Decl. ¶ 37; Losee USP Med. R. at 231.)

42.  On August 24, 2007, Dr. Roberts saw Losee so that he
could review his blood sugar levels with him.  Losee informed Dr.
Roberts that he was happy with the current arrangement, and that
his blood sugar had been ranging from 20 to 105 in the morning.
Losee also said that at noon that day his blood sugar was 228,
but explained that the high reading resulted from mis-counting
his carbs in dosing his insulin after breakfast.  (Roberts Decl.
¶ 38; Losee USP Med. R. at 231.)  Dr. Roberts told Losee that he
could continue with the current system.  (Roberts Decl. ¶ 39;
Losee USP Med. R. at 231.)

43. On August 27, 2007, Losee had another high blood sugar
reading, this time it was 435 after breakfast.  (Losee USP Med.
R. at 225.)

44.  On August 28, 2007, Losee had a follow-up visit with the UMC Diabetes Clinic.  He informed Dr. Chamberlain that he was doing well and that his blood sugar levels were 80 to 200 and that he was feeling better overall.  Losee falsely reported to Dr. Chamberlain that he had access to insulin in his cell, and was able to dose with insulin before each meal and at bedtime. (Losee USP Med. R. at 1046-47.)

45.  In fact, Losee did not have access to insulin in his cell then; he was still coming to the infirmary and taking his insulin after meals.  Losee had consistently insisted that he did not want to take the insulin before eating; rather, he preferred eating his meal, then taking his insulin.  (Roberts Decl. ¶ 42.)

46.  On September 7, 2007, Dr. Roberts met with Losee to discuss the latest UMC consult.  During the visit Dr. Roberts recommended that Losee be admitted to the infirmary, so he could have his blood sugar checked and take his insulin before meals and at bedtime, according to UMC recommendations.  Dr. Roberts believed that if the prison medical staff implemented the UMC recommendations exactly, they might better be able to regulate Losee's blood sugar levels.  (Roberts Decl. ¶ 43; Losee USP Med. R. at 196.)

47.  Losee refused to be admitted to the infirmary, and said he was happy with the way things were going.  (Losee USP Med. R.

at 196.)

48. Losee signed an Against Medical Advice (AMA) form, stating that he was refusing Dr. Roberts' advice that he be admitted to the infirmary. (Losee USP Med. R. at 196.)

49. On August 13, 2007, Losee reported to the med tech that his blood sugar level was 65, but when the med tech checked, it was actually 151. (Losee USP Med. R. at 427.)

50. On September 18, 2007, Dr. Roberts changed Losee's order to require him to have his blood sugar checked before meals, and his insulin administered before meals, and at bedtime. With this order, Dr. Roberts was implementing exactly what UMC had recommended. (Roberts Decl. ¶ 47; Losee USP Med. R. at 404.)

51. Dr. Roberts made this change because he had serious concerns about Losee's renal function. As Dr. Roberts noted in his chart entry, Losee had continued to have renal failure. He had also experienced fluctuating blood sugars, at times dangerously high. Dr. Roberts was concerned about Losee's health, and hoped that if the prison medical staff implemented UMC's recommendations exactly, they might better be able to control Losee's diabetes. (Roberts Decl. ¶ 48.)

52. Due to Losee's deteriorating condition, Dr. Garden staffed Losee's case with a team of health care providers. The group concluded that Losee might benefit from being housed in the

special needs area of the Olympus housing unit. (Garden Decl. ¶¶ 23-24.)

53.    The Olympus special needs section has its own nursing station, and also holds multiple pill lines and receives more frequent visits from medical staff, including night time visits if necessary. (Garden Decl. ¶ 23.)

54.    The medical staff believed that if Losee were in Olympus his blood sugar could be checked immediately before meals and at bedtime, he could also receive the appropriate insulin dosage based on the calories in each meal. (Garden Decl. ¶ 24.)

55.    The staffing team believed Olympus was the only housing option for Losee, other than the infirmary, where he could receive insulin four times a day, as recommended by UMC.  Based on Losee's refusal to stay in the infirmary the team decided to move Losee to Olympus in hopes of improving his diabetic condition. (Garden Decl. ¶¶ 25-26.)

56.    The decision to move Losee was made without Dr. Roberts' input. (Roberts Decl. ¶ 52.)

57.    Losee was very unhappy at Olympus and told staff that he believed he had been illegally housed with the mentally ill in retaliation for filing grievances.  The nurse encouraged him to get control of his blood sugar while he was in Olympus.  Losee said this would never happen because of the stress he felt from

being housed there. He was encouraged to discuss his concerns with his therapist. (Losee USP Med. R. at 497.)

58. Shortly after September 21, 2007, Dr. Garden received a letter addressed "To Whom It May Concern" from Dr. Chamberlain at UMC. Dr. Chamberlain expressed concern that his recommendations were not being followed and that Losee's care was not in compliance with American Diabetes Association (ADA) guidelines for correctional facilities. (Compl. Ex. 1.)

59. Dr. Chamberlain also noted that Losee had been moved to a special needs unit and suggested that Losee's diabetes would be better controlled if he were moved back to his prior placement. (Garden Decl. ¶ 29.)

60. Dr. Garden responded to Dr. Chamberlain's letter on or about October 15, 2007, and a copy of Garden's letter was scanned in to Losee's M-Track files. (Garden Decl. ¶ 30; Losee USP Med. R. at 1037-38.)

61. Dr. Garden's letter explained that the ADA's guidelines were being followed, that Losee's diabetes was better controlled at that time than it had been before he was incarcerated, and that he believed at least part of the reason Losee's diabetes was not optimally controlled was that Losee was not maintaining a proper diet, exercise, etc. (Garden Decl. ¶ 31; Losee USP Med. R. at 1037-38.)

62.  Dr. Garden also expressed his belief that Dr. Chamberlain was not getting a complete or accurate picture of the care the prison was providing and of what Losee was or was not doing to control his diabetes. (Garden Decl. ¶ 32' Losee USP Med. R. at 1037-38.)

63.  Dr. Garden invited Dr. Chamberlain to contact him directly if he had further concerns or wished to discuss the prison's efforts to adequately treat Losee's diabetes.  (Garden Decl. ¶ 33; Losee USP Med. R. at 1037-38.)

64.  On October 25, 2007, Dr. Garden met with Losee's therapist, Mike Hoglund, to discuss Losee's dissatisfaction with being housed in Olympus.  Garden observed that without Losee's cooperation his diabetes would not improve in Olympus and might get worse.  From this discussion Dr. Garden became concerned that Losee might try to sabotage his treatment so that he could be moved back to Oquirrh 5.  (Garden Decl. ¶¶ 34-35; Losee USP Med. R. at 490-91.)

65.  Dr. Garden and Hoglund met with Losee twice on October 25, 2007, and informed him of their recommendations and the medical risks of moving back to Oquirrh 5.  Losee expressed his strong preference to move back to Oquirrh 5 and his belief that he could better control his diabetes there.  (Garden Decl. ¶¶ 34-36; Losee USP Med. R. at 490-91.)

66.   On November 9, 2007, the decision was made to allow
Losee to move back to Oquirrh 5, after he signed an AMA form.
(Losee USP Med. R. at 433-34.)

67.   After moving back into general population Losee was
given his own glucometer so he could test his blood sugar before
each meal and at bedtime.   Arrangements were also made for
Plaintiff to receive Humalog insulin with each meal in addition
to the Lantus insulin.

### IV. Defendants' Motion for Summary Judgment

Plaintiff's allegations have been narrowed to two claims of
cruel and unusual punishment under the Eighth Amendment,
including: (1) failure to properly treat Plaintiff's diabetes;
and, (2) failure to promptly treat Plaintiff's potassium
imbalance.   Defendants move for summary judgment on each of these
claims asserting that Plaintiff has not presented sufficient
evidence to show a constitutional violation.   Defendants further
assert that even if Plaintiff can show a constitutional violation
they are entitled to qualified immunity because the relevant
standard of care was not clearly established at the time of the
alleged violations.   After explaining the relevant legal standard
the court will address each of Plaintiff's claims in turn.

### A. Eighth Amendment Standard

In *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976), the

19

Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (quoting *Greg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909 (1976)). To support an Eighth Amendment claim for denial of medical care an inmate must establish two elements: (1) that he had a serious medical need; and, (2) that the defendants were deliberately indifferent to that need. *Id.* "Deliberate indifference involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970 (1994). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

The subjective component is met only if a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Allegations of negligence in diagnosing or treating a

medical condition, *Estelle*, 429 U.S. at 105, or "inadvertent failure to provide adequate medical care," *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996), are insufficient to state a claim under the Eighth Amendment. "Delay in [providing] medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Sealock*, 218 F.3d at 1210. The Tenth Circuit has held that the "substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 949, 950 (10th Cir. 2001).

## B. Diabetes Claim

It is undisputed that Plaintiff's diabetes is a serious medical condition. The facts clearly show that Plaintiff is a "brittle" diabetic, that he requires regular insulin injections to control his blood sugar levels, and that on numerous occasions Plaintiff experienced dangerously high blood sugar levels which, if left untreated, could lead to blindness, kidney damage, and nerve damage possibly requiring limb amputation. Moreover, numerous doctors have examined Plaintiff and determined that his condition mandates treatment. Thus, there is no question that Plaintiff's diabetes is a sufficiently serious medical condition to satisfy the objective component of the deliberate indifference standard.

The critical question in this case is whether Defendants showed deliberate indifference by failing to properly treat Plaintiff's diabetes.  Plaintiff offers three primary arguments in support of a finding of deliberate indifference.  First, that upon Plaintiff's arrival at the prison Dr. Tubbs knowingly discontinued Plaintiff's prescription for Humalog insulin. Second, that Defendants failed to implement the UMC treatment recommendations in a timely manner.  And, third, that Defendants moved Plaintiff to the Olympus special needs housing unit ("Olympus") in retaliation for his insistence that he be allowed to follow the UMC treatment recommendations while remaining in general population.

### i. Dr. Tubbs

Plaintiff contends that Dr. Tubbs showed deliberate indifference by temporarily discontinuing Plaintiff's Humalog insulin and requiring him to use regular insulin instead. Plaintiff asserts that Tubbs knew from Plaintiff's ADC medical records that he required fast-acting Humalog insulin in order to properly manage his condition.  Plaintiff further contends that Tubbs knew changing Plaintiff's regimen would adversely affect his health but decided to make the change anyway because it was more economical and convenient for the prison.

In his sworn declaration Tubbs states that the dosage and

22

type of insulin he prescribed for Plaintiff was based on "[Plaintiff's] history given to me from what he was taking prior to coming to prison." (Tubbs Decl. ¶ 7.) It is unclear whether this statement refers to Plaintiff's verbal statements or his medical records. In any case, what is clear from the record is that Tubbs was not setting a long term treatment regimen for Plaintiff but was merely prescribing temporary treatment until Plaintiff could undergo further evaluation. The record also shows that because Tubbs was merely doing an initial intake screening his treatment decision was constrained by normal prison operating procedures, which allowed only twice-daily medications. Tubbs was also aware that once Plaintiff was thoroughly evaluated special arrangements could be made to better accommodate his needs. Moreover, there is no evidence that Plaintiff immediately objected to this temporary arrangement, for instance by insisting on being housed in the infirmary rather than general population. Nor is there any evidence that Plaintiff experienced serious complications during the one-month period when he was receiving the treatment prescribed by Tubbs.

Based on these considerations the Court concludes that the evidence here does not support a finding that Dr. Tubbs was deliberately indifferent to Plaintiff's medical needs. Although the temporary insulin regimen prescribed by Tubbs was not

identical to what Plaintiff was receiving previously, and may not have been optimal, the change was clearly based on reasonable logistical and security concerns and there is no evidence that Tubbs subjectively perceived any substantial risk to Plaintiff.

### ii. UMC Recommendations

Plaintiff contends that Defendants showed deliberate indifference by failing to fully implement the UMC treatment recommendations for approximately three and a half months. Plaintiff was evaluated by Dr. Chamberlain at the UMC clinic on June 1, 2007. Based on this evaluation Dr. Chamberlain recommended that Plaintiff check his blood sugar before each meal and at bedtime and that he receive Humalog insulin with each meal. These recommendations were not fully implemented until September 18, 2007.

The record shows that the failure to promptly implement the UMC recommendations was not a result of deliberate indifference but was due to valid administrative and security limitations. There is no dispute that at the time the UMC recommendations were made they could not be fully implemented under normal operating procedures for general population housing areas. Under those procedures blood sugar tests and insulin had to be administered through the pill-line which was only conducted twice-daily, in the morning and evening. Given the obvious security and

logistical concerns inherent to distributing a variety of prescription medications to so many inmates, adherence to the pill-line procedure for general population inmates was clearly not just a matter of cost or convenience. While the UMC recommendations may have represented the optimal treatment plan for Plaintiff, they did not take into account the security and logistical considerations of the prison environment. It therefore fell to Defendants' to determine how best to implement the recommendations in the prison setting.

Bearing this in mind, Dr. Roberts' initial determination that housing Plaintiff in the infirmary was the only way to fully implement the UMC recommendations is understandable. Roberts' decision not to raise this option with Plaintiff initially and to instead explore modifications to the UMC recommendations was also reasonable based on Plaintiff's expressed satisfaction with his current housing assignment and his written statement to Dr. Garden asking not to be transferred out of Oquirrh 5. Plaintiff's refusal to enter the infirmary in September, after months of difficulty controlling his blood sugar, supports this conclusion.

While determining how best to implement the UMC recommendations Dr. Roberts stayed abreast of Plaintiff's blood tests and met regularly with Plaintiff to discuss any issues that

arose.  During their visit on July 31, 2007, Dr. Roberts offered Plaintiff the option of moving to the infirmary so that the UMC recommendations could be followed exactly but Plaintiff declined. On August 9, 2007, Dr. Roberts gave Plaintiff a medical clearance to go to the infirmary three times per day, within thirty minutes of each meal, to receive his insulin.  When Plaintiff began having dangerously high blood sugar levels in mid-August Dr. Roberts met repeatedly with Plaintiff to discuss steps Plaintiff could take to better manage his condition.  Based on assurances from Plaintiff, Dr. Roberts allowed Plaintiff to continue with the modified UMC regimen and remain in general population. During this time, Plaintiff also had followup consultations with the UMC clinic on August 10th and August 28th, which did not make any additional recommendations about Plaintiff's diabetes treatment.  On September 7, 2007, Dr. Roberts again recommended that Plaintiff be admitted to the infirmary so he could have his blood sugar checked and take his insulin before meals and at bedtime but Plaintiff again refused, choosing instead to sign an against-medical-advice (AMA) form and to remain in general population.  After Plaintiff's condition continued to deteriorate Dr. Roberts gave special orders to fully implement the UMC recommendations before referring the case to Dr. Garden.

Dr. Roberts actions do not demonstrate deliberate

indifference, instead, the record clearly shows that Dr. Roberts made every effort to balance the difficulty of implementing the UMC recommendations in a general population setting while still ensuring adequate care for Plaintiff.  Although Dr. Roberts did not fully implement the UMC recommendations immediately, he continually explored alternatives and made adjustments to Plaintiff's treatment as required by his condition.  Moreover, based on Plaintiff's commissary purchases and statements that his diabetes would never be controlled while in prison, Dr. Roberts had ample reason to believe Plaintiff's difficulties were due, at least in part, to his refusal to properly manage his diet. Encouraging Plaintiff to take more personal responsibility before placing additional burdens on prison medical staff does not amount to deliberate indifference.  Finally, even if Plaintiff could show that the decision to implement the UMC recommendations piecemeal was negligent that would not be sufficient to support a constitutional claim.  Thus, the Court concludes that the record does not support a finding of deliberate indifference based on Defendants' failure to immediately implement the UMC treatment recommendations in full.

### iii. Olympus Housing

Plaintiff asserts that after Dr. Roberts made arrangements for Plaintiff to follow the UMC treatment recommendations in

Oquirrh 5, Dr. Garden retaliated by transferring Plaintiff to the Olympus special needs housing unit, causing his condition to worsen.  Plaintiff relies on Dr. Garden's letter to Dr. Chamberlain (Losee USP Med. R. at 1037)--responding to Chamberlain's inquiry about the Olympus move and the failure to implement the UMC recommendations--as support for his contention that Dr. Garden acted in bad faith.

The record shows that the decision to transfer Plaintiff to Olympus was not made solely by Dr. Garden but was based on consultation with a team of health care providers.  The team concluded that Plaintiff might do better in the Olympus special needs section because it had its own nursing station, held multiple pill lines, and received more frequent visits from medical staff, including night time visits if necessary.  (Garden Decl. ¶ 23.)  Based on these considerations it was reasonable to assume that Plaintiff would receive better care in Olympus. Although the decision may also have been influenced by the difficulty of continuing to implement the UMC recommendations in Oquirrh 5, such considerations do not show deliberate indifference.

Dr. Garden's letter to Dr. Chamberlain also does not support the conclusion that the move to Olympus was retaliatory. Although the letter clearly indicates Dr. Garden's disappointment

with Plaintiff's efforts to help manage his condition, and Dr.
Garden's disagreement with Dr. Chamberlain's assertion that
Defendants were not following UMC's recommendations or the
American Diabetes Association's guidelines, the letter says
nothing about the decision to transfer Plaintiff to Olympus.
Instead, the letter points out that Plaintiff's test results
showed he was receiving treatment and that his condition was much
better managed than before he was incarcerated.

Dr. Garden's actions following Plaintiff's transfer to
Olympus also undermine Plaintiff's assertion of retaliation. The
record shows that Dr. Garden continued to monitor Plaintiff's
care in Olympus and that he attempted to work with Plaintiff's
therapist to help Plaintiff adjust to the new arrangement. When
Dr. Garden became concerned that Plaintiff was trying to sabotage
his care in Olympus he took immediate action to address the
situation. Finally, after finding the situation unworkable and
explaining to Plaintiff the possible risks, Dr. Garden allowed
Plaintiff to move back to Oquirrh 5 against medical advice. In
all, Plaintiff spent less than two months in the Olympus special
needs unit.

Based on Dr. Garden's consultation with other doctors prior
to the move, his ongoing efforts to address Plaintiff's concerns
while in Olympus, and his decision to allow Plaintiff to return

to Oquirrh 5 after a relatively short period, the Court concludes that the evidence does not support a finding of deliberate indifference based on Plaintiff's trial transfer to the Olympus special needs unit.

In sum, none of the arguments put forth by Plaintiff to show deliberate indifference by Defendants are supported by the record. Thus, the evidence here does not support an Eighth Amendment claim for failure to property treat Plaintiff's diabetes.

### C. Potassium Imbalance

Plaintiff asserts that Defendants subjected him to cruel and unusual punishment by failing to timely treat him for a potassium imbalance. Plaintiff asserts that this failure caused him to develop a heart arrhythmia and also worsened his diabetes.

Turning to the first prong of the cruel and unusual punishment standard the Court finds insufficient evidence to show that Plaintiff's potassium imbalance was sufficiently serious to state and Eighth Amendment claim. While the record shows that high potassium levels may cause heart problems or other complications, there is insufficient evidence that the levels Plaintiff experienced caused any injury or placed him in any serious jeopardy. Plaintiff has offered no evidence to support his contention that he developed a heart arrhythmia. Although

30

Plaintiff included with his declaration one page from his electrocardiogram, that document does not show any abnormalities. (Losee Decl. Ex. 1.) Moreover, Dr. Roberts' Declaration states that the electrocardiogram showed normal sinus rhythm, meaning no arrhythmia, and no other abnormalities that could be attributed to high potassium levels. (Roberts Decl. ¶ 22.) In addition, after prescribing medication and performing additional blood tests, which still showed elevated potassium levels, Dr. Roberts concluded that Plaintiff's high potassium levels were a chronic condition which he tolerated fairly well. (Roberts Decl. ¶ 29.)

Even assuming that Plaintiff's high potassium level was objectively sufficiently serious, the evidence does not show that Defendants were deliberately indifferent to this condition. The record shows that immediately after reviewing Plaintiff's blood-work Dr. Roberts ordered an electrocardiogram and directed that Plaintiff be placed on a low potassium diet. Two weeks later, on July 31, 2007, Dr. Roberts discussed with Plaintiff the importance of maintaining a low potassium diet in order to prevent diabetes complications. The following day, Dr. Roberts re-tested Plaintiff and found that his potassium level had dropped from previous levels. Based on this finding Dr. Garden decided to wait until after Plaintiff's scheduled visit to the UMC nephrology department on August 10, 2007, before changing his

medications.  Based on the UMC consultation, Plaintiff was prescribed medication to help him excrete potassium.

Even assuming that Dr. Roberts' decision to forego prescribing medication until after the nephrology consultation was a mistake, it was clearly based on valid medical judgment. Moreover, Plaintiff has not shown any substantial injury resulting from the delay.  Plaintiff's assertion that Defendants should have treated him for a potassium imbalance immediately upon his arrival at the prison is similarly flawed.  Even if Plaintiff was receiving potassium medication before arriving at the prison Defendants could have reasonably decided to forego medication until after additional testing was completed.

Thus, the evidence here does not support a claim for failure to property treat Plaintiff's potassium imbalance.

### D. Conclusion

Defendants have satisfied their burden on summary judgment of showing an absence of evidence to support Plaintiff's claims. Because Plaintiff has not presented sufficient evidence to show a genuine issue of fact remaining for trial summary judgment for Defendants is appropriate.  Moreover, because Plaintiff has not shown that Defendants' actions violated any constitutional right, the court need not decide whether Defendants are entitled to qualified immunity.

**ORDER**

Accordingly, **IT IS HEREBY ORDERED** that:

(1) Defendant's Motion for Summary Judgment (Dkt. no. 74) is **GRANTED**; and,

(2) this case is **CLOSED**.

Dated this 30th day of September, 2010.

BY THE COURT:

_____
DEE BENSON
United States District Judge